UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| STURGIS MOTORCYCLE RALLY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RUSHMORE PHOTO & GIFTS, INC.; JRE, INC., CAROL NIEMANN; PAUL A. NIEMANN; BRIAN M. NIEMANN; and WAL-MART STORES, INC., <br><br> Defendants, <br><br> -AND- <br><br> RUSHMORE PHOTO & GIFTS, INC.; JRE, INC.; CAROL NIEMANN; PAUL A. NIEMANN; and BRIAN M. NIEMANN, <br><br> Counterclaimants, <br><br> vs. <br><br> STURGIS MOTORCYCLE RALLY, INC., <br><br> Counterclaim Defendant. | CIV. 11-5052-JLV <br><br><br><br><br> ORDER |

**INTRODUCTION**

On April 24, 2012, plaintiff Sturgis Motorcycle Rally, Inc., ("SMRI") filed an amended complaint alleging trademark infringement and other claims. (Docket 52). On May 4, 2012, defendants Rushmore Photo & Gifts, Inc., JRE, Inc., Carol Niemann, Paul Niemann, and Brian Niemann (jointly referred to as the "RPG Defendants") filed their answer and counterclaim. (Docket 55). On May 16,

2012, SMRI filed its reply to the RPG Defendants' counterclaim.   (Docket 58).
On May 18, 2012, defendant Wal-Mart filed its answer.[1]   (Docket 60).

On October 30, 2015, after a ten-day jury trial, the jury returned a
unanimous verdict in SMRI's favor on the following counts: (1) registered
trademark infringement, (2) unregistered trademark infringement; (3) trademark
dilution; (4) deceptive trade practices; (5) violations of the Anti-Cybersquatting
Consumer Protection Act; (6) false advertising; and (7) unfair competition.
(Docket 264).   The jury unanimously found in favor of SMRI on its claims of
infringement of the registered STURGIS®, STURGIS BIKE WEEK®, and
Composite Design marks and of the unregistered STURGIS MOTORCYCLE
RALLY™ and STURGIS RALLY & RACES™ marks (jointly referred to as "SMRI's
Marks").   (Docket 264).   The jury also unanimously found in favor of SMRI on
its claim of dilution of the famous STURGIS® mark.   Id.   The court entered
judgment on those claims in favor of SMRI on December 2, 2015.   (Docket 269).

On December 30, 2015, the defendants filed a motion for judgment as a
matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative,
for a new trial.   (Docket 275).   The defendants also filed a motion asking the
court to enter findings of fact and conclusions of law on the defendants' equitable
defenses.   (Docket 276).

---

[1]For of the remainder of this order, "defendants" refer to Rushmore Photo
& Gifts, Inc., Carol Niemann, Paul A. Niemann, Brian M. Niemann and Wal-Mart
Stores, Inc., but not JRE, Inc.

On December 31, 2015, SMRI filed a motion for a permanent injunction and seeking additional relief.   (Docket 278).   On January 19, 2016, the court entered an amended order staying briefing on all motions pending the filing of the trial transcripts.   (Docket 285).   On February 11, 2016, the court entered a preliminary injunction.   (Docket 299).   In that order, the court denied SMRI's request for a permanent injunction.   Id. at p. 8.   During the injunctive relief hearing held on February 5, 2016, the court advised the parties it would revisit plaintiff's request for a permanent injunction, if appropriate, following resolution of defendants' Rule 50(b) motion and the equitable defenses motion.[2]

The court resolves defendants' two motions (Dockets 275 & 276) in this order.

**ANALYSIS**

**RULE 50(b) MOTION**

The Federal Rules of Civil Procedure governing post-trial motions provide:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.   No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.   In ruling on the renewed motion, the court may:

(1)   allow judgment on the verdict, if the jury returned a verdict;

---

[2]No transcript of the February 5, 2016, hearing was prepared.

(2)     order a new trial; or

(3)     direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

A Rule 50(a) motion can only be granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [plaintiff] . . . ."   Fed. R. Civ. P. 50(a).   "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party."   Howard v. Missouri Bone & Joint Center, Inc., 615 F.3d 991, 995 (8th Cir. 2010) (internal quotation marks and citation omitted).   The court "must not engage in a weighing or evaluation of the evidence or consider questions of credibility . . . and . . . must give great deference to the jury's verdict."   Id. (internal quotation marks and citations omitted).   The court may not reverse a jury's verdict unless it finds "no reasonable juror could have returned a verdict for the non-moving party."   Anderson Marketing, Inc. v. Maple Chase Co., 241 F.3d 1063, 1065 (8th Cir. 2001) (citation and internal quotation marks omitted); see also Structural Polymer Group, Ltd. v. Zoltek Corp., 543 F.3d 987, 991 (8th Cir. 2008) ("In reviewing the sufficiency of the evidence to support the jury's verdict, [the court] interpret[s] the record in a light most favorable to the prevailing party, affirming unless no reasonable juror could have reached the same conclusion.").

During trial, defendants reserved their motion under Fed. R. Civ. P. 50(a) until the close of all the evidence.   (Docket 315 at p. 245:1-15; see also Docket

4

316 at pp. 227:22-228:10).[3]   At the close of all the evidence defendants made and argued their motion pursuant to Rule 50(a) as to all of plaintiff's claims. (Docket 318 at pp. 189:6-272:5).   The court granted defendants' motion as to plaintiff's state registration claims.   Id. at pp. 263:20-264:22.   The remainder of defendants' motion was denied.   Id. at pp. 189:6-272:2.

SMRI moves to dismiss defendants' Rule 50(b) motion as untimely and because the defendants did not file a brief in support of the motion as required by Fed. R. Civ. P. 7(b)(1) and D.S.D. Civ. LR 7.1(B).   (Docket 372 at pp. 3-5).   For these reasons, plaintiff argues the court should deny defendants' Rule 50(b) motion.   Id. at p. 5.

SMRI acknowledges the 28-day deadline under Rule 50(b) was December 30, 2015.   Id. at p. 4.   Defendants' motion was filed on December 30, 2015. (Docket 275).   Defendants' motion also requested a stay of briefing until the trial transcript was received.   Id. at p. 4.   The court granted defendants' motion to stay briefing.   (Docket 277 at p. 1).   Defendants' brief in support of the Rule 50(b) motion was timely filed.   (Docket 349).   Plaintiff's motion to dismiss the defendants' motion as untimely is denied.   (Docket 372 at p. 3).

Each component of the defendants' Rule 50(b) motion will be separately addressed.   The court will summarize the trial testimony in the light most

---

[3]The court cites to transcripts by the docket number page and the lines referenced.

5

favorable to support the jury's verdict.   Anderson Marketing, Inc., 241 F.3d at
1065; Structural Polymer Group, Ltd., 543 F.3d at 991.

A.      "STURGIS"

Defendants argue "STURGIS" is generic and the court must vacate the
jury's verdict and grant the Rule 50(b) motion because "[t]here are no material
facts in dispute with respect to genericness."   (Docket 349 at p. 6).   Defendants
also challenge the court's jury instruction on the definition of "generic."   (Docket
384 at p. 2 n.1).

The court will first address the jury instruction challenge.   Prior to the
pretrial conference, defendants proposed an instruction on the definition of
"generic."   (Docket 174 at p. 52).   Critical to the present analysis is the
language within defendants' proposed instruction which stated:   "If the primary
significance of the alleged mark to the consuming public is to identify the
product or service rather than a single source of that product or service, the term
is a generic name and cannot be a valid trademark."   Id.

The court's proposed "Instruction No. 24—Affirmative Defense-Generic
Name," which ultimately was given to the jury, in material part stated:   "A term
is 'generic' if its primary meaning to prospective purchasers is the product
category itself rather than a single source of that product."   (Docket 235 at p. 38)
(capitalization omitted).   The court's instruction required the defendants to
prove by the greater convincing weight of the evidence the word "STURGIS" was
generic.   Id. at p. 39.

6

During the settlement of primary instructions,[4] defendants objected to the court's proposed language.   (Docket 214 at pp. 177:8-186:25).   Defendants argued:

> [Plaintiff's attorneys] are misstating the law and to limit it that it only can be through a product category; it's also talking about a product; it can also be a service. . . . [I]n in this situation, we have somebody referring to Sturgis that we are putting up evidence that people are going to know what that means.   And I don't mean that they know that Sturgis refers to that generic term I used to refer to that motorcycle rally that takes place around Sturgis in early August of every year.

Id. at p. 181:5-8 & 14-19.   The court asked for briefing to propose a definition of "product category."   Id. at pp. 183:1-17 and 186:13-18.

Plaintiff's counsel assured the court that post-pretrial conference briefing would provide a definition of "product category" for use in the court's instruction. Id. at p. 186:19-20.   Plaintiff did not provide the court with a definition of "product category."   See Dockets 207 & 212.   Defendants' brief reemphasized their objection to the use of the phrase "product category."

> [I]f the primary significance of the name "Sturgis" is to identify the product or service, and not to identify their *source*, then the name "Sturgis" is not entitled to trademark protection. . . . Without question, the Eighth Circuit does not limit the question to a product *category*, as urged by Plaintiff.   Indeed, the question is whether the primary significance of the registered mark to the relevant public is

---

[4]The court settles the "primary instructions" at the pretrial conference in every case.   Primary instructions are read to the jurors before opening statements with each juror in possession of a copy for use throughout trial. "Supplemental instructions" are settled near or after the close of all evidence. These instructions are read to the jurors after closing arguments with each juror possessing a copy.   The verdict form is included in the supplemental instructions.

> to identify the product or to identify the source of that product. . . .
> Because Plaintiff's proposed revision to the jury instruction
> misstates the law, it should be rejected and overruled.

(Docket 210 at pp. 3-4) (emphasis in original) (referencing 15 U.S.C. § 1064(3);

Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 974 (8th Cir. 2006); Nartron

Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 404 (6th Cir. 2002)).   The court

gave Instruction No. 24 without specifying a definition of "product category."

(Docket 235 pp. 38-39).

Extensive testimony and exhibits were presented over the course of the

10-day trial on the issue of "genericness."   During the Rule 50(a) motion

hearing, the court denied defendants' motion for judgment as a matter of law on

this point.

> The affirmative defense of generic name in instruction 24 that's been
> given to the jury and I think there's a sufficient legal basis in the
> evidence for the jury to consider that affirmative defense . . . . They
> are going to weigh the evidence and make a determination as
> whether the elements of this affirmative defense have been proven
> based on the burden of proof. . . . [S]o I am not entering judgment as
> a matter of law that Sturgis is generic . . . .

(Docket 318 at pp. 188:16-189:2).

During the settlement of supplemental instructions immediately following

the Rule 50(a) motion hearing, defendants proposed an "Affirmative Defense-

Generic Name" instruction to modify Instruction No. 24.   (Docket 318 at

pp. 283:24-284:20).   The language of defendants' proposed supplemental

instruction contained the same "product category" language used in Instruction

No. 24.   Defendants' proposed instruction ultimately became "Instruction No.

8

45—Affirmative Defense-Generic Name" in the supplemental instructions given to the jury after closing arguments.   (Docket 252 at p. 6).

Fed. R. Civ. P. 51(d)(1)(A) "requires a litigant to state distinctly the specific objections to a jury instruction before the jury retires; otherwise, a litigant waives the right . . . to object to a jury instruction on those grounds . . . ." Dupre v. Fru-Con Engineering Inc., 112 F.3d 329, 333 (8th Cir. 1997).   By submitting a proposed supplemental instruction with the same "product category" language as Instruction No. 24, defendants waived any objection on this issue. Defendants' challenge to the jury instructions on this basis is denied.

Addressing the parties' cross-motions for summary judgment before trial, the court concluded a material fact issue existed for resolution by the jury as to whether "STURGIS" is generic.   (Dockets 107 at p. 809 and 132 at pp. 3-7).   By its verdict, the jury found the word "STURGIS" is not generic.   (Docket 264 at p. 2).

Defendants challenge the verdict claiming the jury inappropriately ignored the testimony of a number of witnesses.   (Docket 349 at pp. 5-8).   Defendants argue the jury also failed to give weight to the two consumer surveys presented. Id. at p. 8.   Defendants claim the court must vacate the verdict, find defendants' evidence credible and grant the Rule 50(b) motion on the basis "STURGIS" is generic.   Id. at pp. 9-10.

"[J]uries are presumed to be able to follow and understand the court's instructions." Katzenmeier v. Blackpowder Products, Inc., 628 F.3d 948, 952

9

(8th Cir. 2010).   In resolving a Rule 50(b) motion, the court "must not engage in a weighing or evaluation of the evidence or consider questions of credibility . . . and . . . must give great deference to the jury's verdict."   <u>Howard</u>, 615 F.3d at 995.

Defense witness Gabriel Gelb's testimony and 2008 consumer survey were presented for the jury's consideration on the genericness issue for resolving defendants' challenge to Marlin Martin's 2001 affidavit submitted to the United States Patent and Trademark Office ("PTO").   During trial, the court gave the jury an oral instruction as to the limited nature of this testimony.   "Mr. Gelb's testimony is being admitted only for a limited purpose.   You should consider his testimony only as it relates to matters that occurred in the Patent & Trademark Office proceeding during the 2008 time period and for no other purpose." (Docket 318 at p. 28:19-23).   The weight, if any, to give Mr. Gelb's testimony in judging Mr. Martin's 2001 affidavit was for the jury to resolve.

Defendants also presented a 2012 consumer survey by Robert Reitter. Dr. Basil Englis, plaintiff's expert witness, challenged defendants' evidence and identified a number of potential errors committed by Mr. Reitter in developing his survey.   <u>See</u> <u>id.</u> at pp.129:9-138:10; 139:22-149:11; 149:20-150:13.   The weight, if any, given to the testimony of defendants' witness was for the jury to resolve.

10

There is a legally sufficient evidentiary basis to support the jury's verdict that "STURGIS" is not generic.   <u>Howard</u>, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

B.   "STURGIS MOTORCYCLE RALLY," "STURGIS BIKE WEEK," AND "STURGIS RALLY & RACES"

For the same reasons, defendants argue "STURGIS MOTORCYCLE RALLY," "STURGIS BIKE WEEK," and "STURGIS RALLY & RACES" are generic as a matter of law.   (Docket 349 at pp. 10-11).   The defendants claim they and other vendors used these or similar unregistered marks and "sold Sturgis rally-related products long before" the Sturgis Chamber of Commerce, SMRI's predecessor-in-interest, began selling products bearing these marks.   (Docket 384 at pp. 11-13).

By its verdict, the jury found these marks are not generic.   (Docket 264 at pp. 5, 8 and 10).   As with the "STURGIS" mark, the weight given to the trial testimony as to these unregistered marks was for the jury to resolve.   There is a legally sufficient evidentiary basis to sustain the jury's verdict that these marks are not generic.   <u>Howard</u>, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

C.   "STURGIS"—SECONDARY MEANING

Defendants assert their Rule 50(b) motion must be granted because "STURGIS" had not acquired a secondary meaning prior to the defendants' use of this mark.   (Docket 349 at pp. 13-16).   Defendants claim "by virtue of the

11

common use of STURGIS by hundreds of others before, during and after the 1980s and 1990s (the latter being the very latest time by which RPG started using STURGIS on rally-related products), Plaintiff cannot establish secondary meaning." Id. at pp. 13-14 (parenthesis in original; references to the trial record omitted).

Plaintiff argues the trial evidence showed that "[w]hile third parties may promote their own businesses or activities occurring at their facilities, the fact remains that SMR[I] and its predecessor-in-interest, the Sturgis Chamber, have been the only entities promoting the STURGIS® Motorcycle Rally in an official and deliberate capacity. . . . To the extent that any third party 'promotes the rally,' such promotion is incidental to the promotion of the third-party's business."   (Docket 372 at p. 20) (references to the trial record omitted). Plaintiff submits "SMRI introduced evidence that the STURGIS mark became distinctive for goods sold in conjunction with the Sturgis Motorcycle Rally at least as early as the 50th annual rally in 1992, and certainly prior to any use of infringing terms by Defendants." Id. at p. 22.

"Secondary meaning" was thoroughly explained in the court's jury instructions.   See Docket 235 at pp. 45-47.   The weight given the trial testimony on this issue was for the jury to resolve.   There is a legally sufficient evidentiary basis to sustain the jury's verdict that "STURGIS" acquired a secondary meaning.   Howard, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

12

D.    "STURGIS MOTORCYCLE RALLY," AND "STURGIS RALLY &
      RACES"—ACQUIRED DISTINCTIVENESS

Defendants argue these phrases are "at best descriptive names for the

rally."  (Docket 349 at p. 16).   They argue SMRI "offered no evidence whatsoever

to prove that STURGIS MOTORCYCLE RALLY or STURGIS RALLY & RACES

acquired distinctiveness *before* Defendants' first use of the names STURGIS,

STURGIS RALLY, or STURGIS MOTOR CLASSIC on products."  Id. at p. 17

(emphasis in original).

SMRI responds that the jury heard the testimony of Dean Kinney and

Defendant Carol Niemann who "both testified that Defendants, in a contract,

acknowledged Plaintiff's rights in the STURGIS RALLY & RACES™ mark as far

back as 1999, in conjunction with [the RPG defendant's] execution of a license to

give them the right to use Plaintiff's STURGIS Composite Design mark on

postcard products."  (Docket 372 at p. 27) (references to the trial record

omitted).   Plaintiff also asserts another witness "testified that SMRI used the

STURGIS MOTORCYCLE RALLY™ mark 'since we started doing the licensing in

'02', and SMRI presented various products . . . showing usage of that mark to the

jury . . . ."  Id.

The application of a secondary meaning, or acquired distinctiveness, to

SMRI's unregistered marks was addressed in the court's instructions.   (Docket

235 at pp. 45-47).   The weight given to the trial testimony on this issue was for

the jury to resolve.   There is a legally sufficient evidentiary basis to sustain the

13

jury's verdict that these phrases acquired a secondary meaning.   Howard, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

E.     THE COMPOSITE DESIGN MARK

Defendants argue there was no evidence they infringed upon or counterfeited SMRI's Composite Design Mark.   (Docket 349 at pp. 18-19).   The defendants assert there was "undisputed, overwhelming testimony that Defendants never used the Composite Design Mark on unlicensed products," and the verdict must be set aside.   Id. at p. 19.

SMRI argues that "[d]efendants own witnesses, Paul and Brian Niemann, conceded that 'Sturgis Motor Classic' was a combination of certain prominent elements from the STURGIS Composite Design Mark. . . . [And that] Kinney also testified that he found a design on Defendants' products 'that's similar in nature to our Sturgis composite.' "   (Docket 372 at p. 28).

It is not necessary for a defendant to use an exact image of SMRI's Composite Design Mark to support a claim of infringement.   It is the likelihood of confusion among potential consumers between a trademark holder's mark and the defendants' marks which is important.   "Instruction No. 21—Likelihood of Confusion" properly addressed this concept.   (Docket 235 at pp. 31-33) (capitalization omitted).

The jury found the defendants infringed on plaintiff's Composite Design Mark.   (Docket 264 at p. 7).   The jury also found that one or more of the

defendants' STURGIS Designations[5] were a counterfeit[6] of SMRI's Composite Design Mark.   (Docket 264 at 8).   The jury was not required to find that one of the defendants' STURGIS Designations was an exact replica of SMRI's Composite Design Mark, but rather only that a STURGIS Designation was "substantially indistinguishable from" SMRI's mark.   (Docket 235 at p. 33).   The plaintiff's Composite Design Mark included the words "Motor Classic" and "Sturgis Rally," which are substantially indistinguishable from "Sturgis Motor Classic" and "Sturgis Rally" as used by defendants.   Compare Dockets 235 at p. 31 and 264 at p. 7.   Defendants' argument that the jury was never asked to resolve whether defendants produced a counterfeit of the Composite Design Mark is without merit.

The weight given to the trial testimony on this issue was for the jury to resolve.   There is a legally sufficient evidentiary basis to sustain the jury's verdict that the defendants infringed upon and counterfeited SMRI's Composite Design Mark.   Howard, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

---

[5]"The defendants' Sturgis Designations include the following: 'Officially Licensed Sturgis,' 'Authentic Sturgis,' 'Legendary Sturgis,' 'Licensed Sturgis,' 'Official Sturgis,' 'Sturgis Central,' 'Sturgis Motor Classic' and 'Sturgis Rally.' " (Docket 235 at p. 31).

[6]"A 'counterfeit' is a false or fake mark which is identical with, or substantially indistinguishable from, a registered mark."   (Docket 235 at p. 33).

15

F.    DECEPTIVE TRADE PRACTICES CLAIM

Defendants argue the verdict on this claim is defective for two reasons: "(1) Plaintiff did not prove any actual damages; and (2) the four-year statute of limitations barred the claim."   (Docket 349 at p. 20).   Defendants assert because SMRI's cease and desist letter was served on the RPG defendants on August 8, 2006, and the complaint was not filed until June 22, 2011, the claim was barred by the applicable South Dakota statute of limitations.   Id. at p. 21 (referencing SDCL § 37-24-33) ("No action [for deceptive trade practices] may be brought more than four years after the occurrence or discovery of the conduct which is the subject of the action.").

Plaintiff counters the defendants' conduct constituted a continuing tort because they "readily concede that their conduct has continued 'up until the jury verdict.' "   (Docket 372 at p. 29).   SMRI also asserts the trial evidence proved it lost royalties which would otherwise have been earned on products sold by the defendants.   Id. at pp. 29-30.

"Instruction No. 31—Deceptive Trade Practices Claim" was given as a primary instruction for resolution of plaintiff's claim.   (Docket 235 at p. 50) (capitalization omitted).   A supplemental instruction, "Instruction No. 46— Deceptive Trade Practices Claim Damages," clarified that the jury could only consider the defendants' conduct from and after June 22, 2007, in resolving the deceptive trade practices claim and in awarding SMRI damages.   (Docket 252 at

16

p. 8) (capitalization omitted).   This supplemental instruction complied with

SDCL § 37-24-33.

During the conference to settle supplemental instructions, defendants

objected to the clarifying instruction.   (Docket 318 at pp. 241:2-20; 242:7-22

and 273:11-12).   Defendants argued that while the supplemental instruction

"may be a correct statement of the law that [SMRI] could only get damages for

acts that happened four years before, if that acts or those acts began before the

four years, that's what the purpose of the statute of limitations is for and it's

improper."   Id. at p. 241:16-20.

In resolving defendants' objection during the supplemental instructions

settlement conference, the court concluded:

> If deceptive trade practices occurred within four years of the filing of
> the complaint, that is, after June 22, 2007, I think those claims are
> alive if they are proven and damages can result, but not from the
> period prior to June 22, 2007.   That's my view of the public policy
> approach to this statute of limitation matter. . . . that's the ruling.

Id. at pp. 243:23-244:9.

South Dakota recognizes the continuing tort theory.   "A continuing tort

occurs when a wrongful act persists over time."   Brandt v. Cty. of Pennington,

827 N.W.2d 871, 875 (S.D. 2013) (citing Holland v. City of Geddes, 610 N.W.2d

816, 818 (2000) (additional citation omitted).   "To constitute a continuing tort,

. . . all elements of the tort must be continuing, including breach of duty and

damages."   Id. (citations omitted).   "A continuing tort tolls the statute of

limitations . . . . The reason a continuing tort suspends the running of the statute

17

of limitations is that when no discrete occurrence in continually wrongful conduct can be singled out as the principal cause of damage, the law regards the cumulative effect as actionable, and allows the limitations period to begin when the wrongful conduct ends." Id. (internal citations and quotation marks omitted).

"A classic instance of a continuing tort occurs with prolonged or repeated flooding of land." Holland, 610 N.W.2d at 818. Much like a repeated flooding of land, defendants flooding of the market with its products constitutes a continuing tort. Plaintiff is entitled to reach back in time to the last qualifying date under the statute of limitation, in this case, June 22, 2007.

Supplemental Instruction No. 46 is an accurate statement of the law and was properly considered by the jury in awarding damages to plaintiff. See Docket 263 at pp. 14-15. Defendants' Rule 50(b) motion on this basis is denied.

G.    TRADEMARK DILUTION CLAIM

The court's instruction on plaintiff's trademark dilution claim is a correct statement of the law and was unopposed by the defendants. See Dockets 214 at p. 206:15-21 and 235 at pp. 48-49. As to the evidence on this claim, defendants argue none of SMRI's Marks were ever famous and certainly not before the RPG Defendants began using their Sturgis Designations. (Docket 349 at p. 21). Defendants assert plaintiff "failed to prove damages because it could not prove that a defendant started using a Sturgis Designation in commerce *after* October 6, 2006. By August 2006, Plaintiff had already accused Defendants of

18

infringing for their use of their Sturgis Designations. . . . Moreover, Defendants provided extensive evidence that they had been using 'Sturgis' on products going back into at least the mid 1980s."   Id. at p. 22 (internal reference omitted, emphasis in original).   These are the same arguments defendants made for their Rule 50(a) motion.   (Docket 318 at pp. 229:6-231:5 and 232:12-233:2).

SMRI argues the trial evidence showed "that, beginning in 2007, the character of Defendants' use changed."   (Docket 372 at p. 30).   Those changes included marketing products as "SMC™, Sturgis Motor Classic™, Legendary™, Oldest Biggest Best™ [and] Licensed Sturgis™."   Id. (internal reference to the record omitted).

The defendants counter plaintiff's cease and desist letter acknowledged SMRI knew of defendants' use of "Sturgis Motor Classic," "Officially Licensed Sturgis™ Products," and "Authentic Sturgis Motor Classic™ Gear" before the date of the letter, August 8, 2006.   (Docket 384 at pp. 15-16) (referencing Trial Exhibit 52).   Based on this letter, defendants argue SMRI did not prove use of a Sturgis Designation after October 6, 2006.   (Docket 384 at p. 16).

There was evidence presented to the jury that after 2006 the RPG defendants intensified their efforts to "use[] an identical or nearly identical version of SMRI's trademark to identify the [RPG defendants'] goods or services" thus blurring or tarnishing plaintiff's mark.   See Docket 235 at p. 49.

The weight given to the trial testimony on this issue was for the jury to resolve.   There is a legally sufficient evidentiary basis to sustain the jury's

verdict that the defendants engaged in trademark dilution.   <u>Howard</u>, 615 F.3d at 995.   Defendants' Rule 50(b) motion on this basis is denied.

H.    OTHER ANCILLARY STATE CLAIMS

Defendants argue that because all of "[p]laintiff's ancillary claims of trademark dilution, deceptive trade practices, anticybersquatting consumer protection act, false advertising, and unfair competition . . . are based on the validity of Plaintiff's STURGIS, STURGIS BIKE WEEK, STURGIS RALLY & RACES, and STURGIS MOTORCYCLE RALLY marks[]," those claims must fail for the same reasons the STURGIS claim must fail.   (Docket 349 at p. 22).

Based on the court's rulings upholding the jury's verdict on the validity of SMRI's Marks, the defendants' 50(b) motion attacking these ancillary state claims is denied.   There is a legally sufficient evidentiary basis to sustain the jury's verdict on these claims.

I.    JRE, INC.

It is undisputed that JRE, Inc., dissolved under South Dakota law on June 30, 2009.   (Trial Exhibit 13 at p. 2).   At the time of dissolution, there were four shareholders:   Paul Niemann, Carol Niemann, Brian Niemann, and Kristen Niemann, Brian's wife.   (Docket 315 at p. 75:13-21).   Just prior to dissolution, all of the assets of JRE, Inc., were sold to Rushmore Photo & Gifts for $35,830.08, and those funds were used to off-set a corporate debt of JRE, Inc., owed to Paul and Carol Niemann.   <u>Id.</u> at p. 76:5-16; <u>see</u> <u>also</u> Exhibit 13 p. 2.

There were no dividends or other corporate asset disbursements made to the four shareholders at the time of dissolution.   (Docket 315 at pp. 76:23-77:1).

During the Rule 50(a) motions hearing, the court advised the parties it would deny defendants' motion to remove JRE, Inc., as a defendant and permit the jury to determine whether damages should be awarded against JRE, Inc. (Docket 318 at p. 261:2-4).   But the court advised the parties it had "the legal obligation to apply [South Dakota law] and determine whether those damages can under the circumstances of this case be awarded against the dissolved corporation."   Id. at p. 261:4-7.

The jury awarded money damages against JRE, Inc., on four of plaintiff's claims.   (Docket 263 at pp. 5-8 and 15-16).   Defendants' Rule 50(b) motion asks the court to vacate these money damages under SDCL § 47-1A-1407.02. (Docket 349 at p. 23).   SMRI argues the motion should be denied because "[d]efendants did not proffer any evidence of the existence of a debt that should preclude SMRI's recovery of the $35,830.08 distributed to JRE's shareholders, Paul and Carol Niemann."   (Docket 372 at p. 34).

JRE, Inc., was dissolved in accord with South Dakota law.   See SDCL §§ 47-1A-1402 & 1402.3.   South Dakota law provides that a claim against a dissolved corporation may be asserted against a shareholder who received assets at the time of dissolution, but only to the extent of the assets distributed to that shareholder.   SDCL § 47-1A-1407.2(2).

21

SMRI presented no evidence at trial to support its claim that the debt testified to by the members of the Niemann family was either non-existent or a fraudulent transaction.   The undisputed testimony is there were no assets distributed to any shareholder of JRE, Inc., at the time of dissolution.   There is no legal basis for permitting SMRI to go beyond JRE, Inc., and seek recovery from Paul and Carol Niemann for money they received in satisfaction of the debt owed to them by JRE, Inc.

Based on the trial record, the court grants defendants' Rule 50(b) motion as to the damage award against JRE, Inc.   The judgment of December 2, 2015, against JRE, Inc., in the sum of $52,400 is vacated.   (Docket 269 at p. 1).

J.     CONCLUSION—RULE 50(b) MOTION

The court concludes there is a "legally sufficient evidentiary basis to find for [plaintiff]" on all claims, except as to JRE, Inc.   Fed. R. Civ. P. 50(a).   The court arrives at this conclusion without engaging in "a weighing or evaluation of the evidence," or judging the credibility of the witnesses, and by "giv[ing] great deference to the jury's verdict."   Howard, 615 F.3d at 995.

Defendants' Rule 50(b) motion is granted in part and denied in part consistent with this order.

**MOTION FOR NEW TRIAL**

A motion for new trial is governed by Fed. R. Civ. P. 59.   "The court may, on motion, grant a new trial on all or some issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted . . . ."   Rule 59(a)(1)(A).

22

When compared to a motion for judgment as a matter of law, "[t]he standard for granting a motion for new trial is higher still."   Howard, 615 F.3d at 995. "Under Rule 59, the decision to grant a new trial lies within the sound discretion of the trial court, and its decision will not be reversed on appeal absent a clear abuse of that discretion."   Id.   "Where the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal."   Id. (internal quotation marks and citations omitted).   "In such circumstances, the court should only grant a new trial to avoid a miscarriage of justice."   Id.   See also Structural Polymer Group, Ltd., 543 F.3d at 991 ("A new trial motion premised on a dispute about the strength of the supporting proof should be granted only if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice.") (citation and internal quotation marks omitted).   Unlike a motion for judgment as a matter of law, in evaluating a motion for a new trial the court "can rely on its own reading of the evidence–it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."   White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992) (citation and internal quotation marks omitted).

The defendants claim the jury fundamentally misunderstood the concept of secondary meaning as instructed on by the court.   The court's formulation of jury instructions is reviewed for an abuse of discretion.   Der v. Connolly, 666 F.3d 1120, 1126 (8th Cir. 2012).   "The trial court has broad discretion in the

23

form and language used in instructions to the jury."   Fink v. Foley-Belsaw Co.,

983 F.2d 111, 113 (8th Cir. 1993) (citing Bissett v. Burlington Northern R.R. Co.,

969 F.2d 727, 729 (8th Cir. 1992) (citation omitted)).   Jury instructions must be

reviewed "to determine whether, taken as a whole, they are confusing or

misleading in presenting the applicable principles of law." Id. (internal citation

omitted).   "The particulars of the instructions are largely within the discretion of

the trial judge."   Hrzenak v. White-Westinghouse Appliance Co., 682 F.2d 714,

720 (8th Cir. 1982).   The court's jury instructions "do not need to be technically

perfect or even a model of clarity."   Der, 666 F.3d at 1126 (internal citation

omitted).   Even if the trial court erroneously instructs a jury, that error is not

reversible error unless it "affects the substantial rights of the parties."   Id.

(internal quotation and citation omitted).

On December 30, 2015, defendants filed a motion for a new trial.   (Docket

275).   Each of defendants' claims for the new trial motion will be separately

addressed.

A.   STURGIS REGISTRATION

In answer to plaintiff's amended complaint, defendants alleged the

registration for the term STURGIS is invalid and unenforceable because of fraud

committed on the United States Patent and Trademark Office ("PTO").   (Dockets

55 at pp. 10 ¶¶ 79 and 25 ¶¶ 45-47 and 60 ¶¶ 79 & 112).   Defendants focus

specifically on the declaration made under oath by then-President of the Sturgis

Chamber, Marlin Martin. (Dockets 55 at     p. 25 ¶¶ 45-47 and 60 ¶ 112).

24

To understand the context of Mr. Martin's declaration some background evidence presented to the jury must be restated here.   On May 8, 2001, an examining attorney with the PTO rejected the application by the Sturgis Chamber to register the term STURGIS.   (Trial Exhibit 769 at pp. 544-51).   In arriving at the decision to reject the application, the examiner concluded "the mark is primarily geographically descriptive of the applicant's goods and services . . . . The primary significance of the term "STURGIS" is geographic, and the applicant's goods and services come from the geographical place named in the mark.   Therefore, a public association of the goods and services with the place is presumed. . . . The proposed mark is unregistrable on the Principal Register." Id. at p. 546) (internal citations and references omitted).

On November 1, 2001, Mr. Martin filed a sworn declaration with the PTO seeking reconsideration of the Chamber's application.   In his declaration, Mr. Martin stated he had "overall management responsibility for the activities of the Chamber, including the marketing and promotion of the STURGIS motorcycle rally (the "Rally") held each August in Sturgis, South Dakota, and the marketing, distribution and sales of a variety of products in connection with the Rally by the Chamber and its authorized licensees."   Id. at p. 583 ¶ 1; see also Trial Exhibit 540 ¶ 1.   Mr. Martin further stated that "[t]he Sturgis Chamber has used the STURGIS mark in commerce in connection with the promotion of motorcycle and vehicle rallies, exhibits and competitions and the promotion of the City of Sturgis and the Black Hills area of South Dakota and Wyoming since at least as early as

25

July 1, 1986."  (Trial Exhibit 769 at pp. 583-84 ¶ 2).   Mr. Martin's declaration

concluded:

> It is my opinion that, as a result of the extensive marketing and promotional efforts of the Sturgis Chamber in connection with the Rally and the Sturgis Chamber's continuous and substantially exclusive use of the STURGIS mark in connection with the marketing and promotion of the Rally since at least as early as July 1, 1987, the purchasing public has come to identify the STURGIS mark with the source of the Sturgis Chamber's Rally Products and its Rally promotion and entertainment services and to recognize that the STURGIS mark distinguishes the Sturgis Chamber's Rally Products and promotion and entertainment services from those sold by others.

Id. at pp. 584-85 ¶ 4.

Defendants assert Mr. Martin's declaration was false because he and the

Sturgis Chamber knew other vendors were using the STURGIS mark before

2001.   (Docket 349 at pp. 23-26).   In its opposition to the Sturgis Chamber's

application with the PTO, Sturgis Motorcycles, Inc., d/b/a Black Hills

Harley-Davidson, d/b/a Sturgis Harley-Davidson (jointly referred to "Sturgis

Motorcycle") on December 11, 2002, declared under oath, among other things:

> Sturgis Motorcycles . . . have continuously used the name STURGIS in commerce on and in connection with the sale of "Rally Products" . . . . at the Sturgis Motorcycle Rally . . . held in and around Sturgis, including Rapid City, SD, in the Black Hills area of South Dakota each year since at least 1981.   (Trial Exhibit 539 at p. 6 ¶ 1).

> Sturgis Motorcycles . . . have continuously used the name STURGIS in commerce in connection with the promotion of the Rally including organizing and sponsoring events at the Rally since at least 1991. Id. ¶ 2.
> . . .

> Sturgis Motorcycles has had gross sales of Rally Products bearing
> the name STURGIS totaling approximately $9 million since 2000.
> Id. at p. 7 ¶ 9.
> . . .
> Many of over 700 vendors use the name STURGIS in connection
> with the sale of Rally Products each year at the Rally.   Id. at p. 8
> ¶ 11.
>
> Many of over 700 vendors use the name STURGIS in connection
> with the promotion of the Rally.   Id. ¶ 12.

In addition to Sturgis Motorcycle, defendants argue the RPG defendants and "other large entities, including the Sturgis Buffalo Chip®, had promoted and marketed the rally and rally-related entertainment and products using the name 'Sturgis' since long before 2001."   (Docket 349 at pp. 25-26) (references to the record omitted).   The defendants further assert Mr. Martin acknowledged "he knew of [Sturgis Motorcycle's] extensive prior use before signing his declaration and that he withheld that information from the Trademark Office."   Id. (references to the record omitted).   Defendants submit that:

> Given the Chamber's knowledge of the widespread use of the name
> "Sturgis" in connection to the promotion of the rally and related
> products, it would be against the weight of the evidence to conclude
> that Martin's representation that the Chamber had continuous and
> substantially exclusive use of the STURGIS mark in connection with
> the marketing and promotion of the Rally since at least as early as
> July 1, 1987 was anything but fraudulently made.

Id. at p. 27.   Defendants seek a new trial on their "fraudulent procurement claim and defense."   Id.

SMRI argues the jury heard Mr. Martin testify he "believe[d] each and every statement made in the declaration to be true at the time" he made those

statements.   (Docket 372 at p. 35) (reference to the record omitted).   SMRI asserts "Mr. Martin cannot have 'known' that his testimony was false if he believed that it was true, nor could he have intended to deceive the USPTO."   Id. at p. 36.   For this reason, SMRI submits there was sufficient evidence presented to the jury that Mr. Martin's PTO declaration was not fraudulent.   Id.

Whether the PTO submission by the Sturgis Chamber was false, with the intent to mislead the PTO, must be established by the defendants by "clear and convincing" evidence.   Orient Express Trading Co., Ltd. v. Federated Department Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988).   The court instructed the jury as to this heightened burden of proof.   (Docket 235 at p. 57). Whether defendants' evidence at trial met this burden of proof was for the jury to resolve.

The court finds there was sufficient evidence to support the jury's decision that the STURGIS registration was not secured by fraud.   Structural Polymer Group, Ltd., 543 F.3d at 991.   The court does not believe a miscarriage of justice will occur if the jury's verdict on the STURGIS Registration is allowed to stand. Id.   Defendants' motion for a new trial on this basis is denied.

B.   ALL OTHER CLAIMS

The defendants move the court, in the alternative, to grant a new trial on all the issues upon which they made a Rule 50(b) motion.   (Docket 349 at p. 27). Defendants claim "[t]he jury's fundamental misunderstanding of secondary

meaning affected every one of Plaintiff's claims, and undoubtedly infected the entirety of the jury's verdict." Id. at p. 28.

"Instruction No. 29–Acquired Distinctiveness" was a proper instruction on secondary meaning.   (Docket 235 at pp. 45-47) (capitalization omitted). During jury deliberations, the jury sent the court a note seeking clarification of secondary meaning: "Can you explain in layman's terms secondary meaning, we are struggling with understanding the instructions as to this term."   (Docket 259 at p. 2).

Before responding to this inquiry, the court engaged counsel in a lengthy discussion about a proper response to the jury note.   (Docket 320 at pp. 3:3-22:19).   The court provided an additional explanation of secondary meaning for the jury's use during deliberations.   (Docket 259 at p. 2).   The court's written response was:

In addition to Instruction No. 29, you should consider the following:

In order to establish secondary meaning, SMRI as the user of a mark, must show that by long and exclusive use in the sale of goods or services by SMRI or its licensees the mark has become so associated in the public mind with the goods or services of SMRI or its licensees that the mark serves to identify the source of the goods or services as those of SMRI or its licensees and to distinguish them from the goods or services of others.

This instruction should be taken together with all the instructions I previously gave you. The instructions must be considered as a whole.

Id.[7]   The jury found in favor of SMRI on the registered and unregistered trademarks.   (Docket 263 at pp. 1-11).

"The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions . . . and strive to understand, make sense of, and follow the instructions given them." Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985).   See also Katzenmeier, 628 F.3d at 952 ("[J]uries are presumed to be able to follow and understand the court's instructions.") (internal citation omitted).   The jury's note illustrates an effort to understand and apply the court's instructions rather than an inability to follow them.   Defendants' motion for new trial on this basis is denied.

C.   CONCLUSION

The court concludes the verdict is not against the weight of the trial evidence and permitting the verdict to stand will not result in a miscarriage of justice.   Structural Polymer Group, Ltd., 543 F.3d at 991.   Defendants' motion for a new trial is denied.

**EQUITABLE DEFENSES MOTION**

The Lanham Act specifically recognizes the equitable defenses of acquiescence and laches.

> To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. . . . Such conclusive evidence of the right to use

---

[7]Defendants' only objection to the additional instruction was to the inclusion of SMRI's "licensees" in the explanation.   (Docket 320 at p. 22:8-9).

> the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects:
> . . .
> (9)     That equitable principles, including laches, estoppel, and acquiescence, are applicable.

15 U.S.C. § 1115(b)(9)).   "[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." Petrella v. Metro-Goldwyn-Mayer, Inc., ___ U.S. ___, 134 S. Ct. 1962, 1973 (2014). "[T]he Lanham Act, which governs trademarks, contains no statute of limitations, and expressly provides for defensive use of 'equitable principles, including laches.' " Id. at 1974 n.15 (citing 15 U.S.C. § 1115(b)(9)).

RPG defendants' answer to plaintiff's first amended complaint asserted equitable defenses:   "Plaintiff's claims are barred in whole or in part by the doctrines of acquiescence . . . estoppel . . . and/or laches." (Docket 55 at p. 8 ¶ 66).   Their answer specifically referenced the Lanham Act as part of their equitable defenses:   "Plaintiff's claims are barred in whole or in part pursuant to 15 U.S.C. § 1115(b)(9) inasmuch as equitable principles, including laches, estoppel, and acquiescence, are applicable." Id. at p. 10 ¶ 81.   Defendant Wal-Mart's answer asserted these same equitable defenses.   See Docket 60 ¶¶ 66 and 81.   In response to the RPG Defendants' counterclaim, SMRI's reply asserted by affirmative defense that "Defendants' claims are barred by Defendants' own unclean hands." (Docket 58 at p. 9 ¶ 5).

31

ACQUIESCENCE

The equitable defense of estoppel by acquiescence is "created by a plaintiff's knowing acquiescence in a defendant's activities."   Minnesota Mining & Mfg. Co. v. Shurtape Technologies, Inc., No. CIV. 98-2134, 2001 WL 530551, at *7 (D. Minn. May 17, 2001).   Acquiescence occurs when a trademark holder "through affirmative word or deed, expressly or impliedly consents to the infringement."   Id. (referencing 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32.105 (4th ed.).   The elements of estoppel applicable to an acquiescence defense in this case are:

(1)     knowledge by SMRI or its predecessors-in-interest of the RPG Defendant's use of a mark;

(2)     SMRI's or its predecessors-in-interest's implied or express consent to the use of the mark by the RPG Defendants; and

(3)     A change in position by the RPG Defendants in reliance on the conduct of SMRI or its predecessors-in-interest.

See Pennzoil-Quaker State Co. v. Miller Oil & Gas Operations, 779 F.3d 290, 294 (5th Cir. 2015) (the court analyzes the elements of acquiescence used by the circuits).

LACHES

"Laches is an equitable defense to an action to enforce a trademark." Roederer v. J. Garcia Carrion, S.A., 569 F.3d 855, 858 (8th Cir. 2009).   "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted."   Id.

at 858-59.   See also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 602 (8th Cir. 1999) (same).   "[L]aches denotes a merely passive consent, while acquiescence implies active consent."   6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:41 (4th ed.) (citations omitted).

"For laches, timeliness is the essential element."   Petrella, 134 S. Ct. at 1977.   "[T]he District Court, in determining appropriate injunctive relief . . . may take account of [plaintiff's] delay in commencing suit."   Id. at 1978.   One reason for the consideration of timeliness "is the difficulty in proving damages long after the fact: Proving damages in infringement cases is notoriously difficult, and delay in bringing the question to court can increase those difficulties substantially.   Another reason is the inequity of a plaintiff waiting for defendant to build up its business and profits and years later files suit and demands an accounting of those profits."   6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 31:4 (4th ed.) (internal quotation marks and citation omitted).

In order to prevail on a laches defense, the defendants are obligated to prove the following:

(1)   A delay [by SMRI] in asserting a right or a claim;

(2)   That the delay [by SMRI] was not excusable; and

(3)   That there was undue prejudice to the [RPG Defendants] against whom the claim is asserted.

33

Roederer, 569 F.3d 859.   "In addition, in trademark suits, courts consider two additional factors when evaluating the merits of a laches defense:   (1) the doctrine of progressive encroachment, and (2) notice to the defendant of the plaintiff's objections to the potentially infringing mark."   Id.

"[U]nder the doctrine of progressive encroachment, the time of delay is to be measured not from when the plaintiff first learned of the potentially infringing mark, but from when such infringement became actionable and provable."   Id. The laches defense is not available "when the defendant knew that the plaintiff objected to the use of the mark," as "[a]ny acts after receiving a cease and desist letter are at the defendant's own risk."   Id. (internal citation omitted).   "[T]he determination of whether laches applies . . . [is] a matter within the sound discretion of the district court . . . review[ed] . . . for an abuse of discretion."   Id. at 858 (internal citation omitted).   "Whether laches should be applied depends upon the facts of the particular case. . . ."   Id. (internal citation omitted). "When a defendant has invested generally in an industry, and not a particular product, the likelihood of prejudicial reliance decreases in proportion to the particular product's role in the business."   Id. at 861.   The defense of laches is not available when "the defendant's investment was in an entire industry, not the plaintiff's particular mark."   Id. (internal citation omitted).

Courts have applied the doctrine of laches when a claimant delays enforcement of a trademark for any number of years depending upon the particular facts of each case.   See Tough Traveler, Ltd. v. Outbound Products,

34

60 F.3d 964, 968 (2d Cir. 1995) (one-year delay); <u>MCV, Inc. v. King-Seeley Thermos Co.</u>, 870 F.2d 1568, 1571-72 (Fed. Cir. 1989) (four-year delay); <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 192-93 (2d Cir. 1996) (five-year delay); <u>Hilton International Co. v. Hilton Hotels Corp.</u>, 888 F. Supp. 520, 535 (S.D.N.Y.1995) (eight-year delay); and <u>Hubbard Feeds, Inc.</u>, 182 F.3d at 602 (9-year delay).   Although the expenditure of significant funds by a defendant to build up a business or increase inventory is not dispositive, "[w]hen . . . one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use . . . ."   <u>Hubbard Feeds, Inc.</u>, 182 F.3d at 602 (citing <u>Hilton International Co.</u>, 888 F. Supp. at 535).

LEGAL CLAIMS AND EQUITABLE DEFENSES

"Generally, where one party brings legal and equitable claims, the jury's factual determination is binding on the court's equitable determination."   <u>Blue Cross Blue Shield of Minnesota v. Wells Fargo Bank, N.A.</u>, 816 F.3d 1044, 1049 (8th Cir. 2016).   "[W]hen legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issues common to both."   <u>Id.</u> (citing <u>Song v. Ives Lab., Inc.</u>, 957 F.2d 1041, 1048 (2d Cir.1992)).   This principle is subject to waiver.   <u>Id.</u>   The question is whether the parties have "prospectively waived [the] ability to bind the court to the jury's verdict in a separately tried [equitable] claim."   <u>Id.</u>

"When there are discrete legal and equitable claims, the common questions of fact on the legal claim must be tried first before a jury."   6 J.

35

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:126 (4th ed.) (referencing Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962)).   "[W]hen both legal and equitable issues are presented in the federal courts, the rule is 'jury issues come first.' "   Id.   "It is clear that a judge sitting at equity may not render a verdict which is inconsistent with that of a jury sitting at law on a claim involving the same essential elements.   This is because '[w]hen legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issues common to both.' "   Song, 957 F.2d at 1048 (citing Lincoln v. Board of Regents of University System, 697 F.2d 928, 934 (11th Cir. 1982) (citing Dairy Queen, 369 U.S. at 470-473).   "When a party has the right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."   Lincoln, 697 F.2d at 934.   "Where an irreconcilable inconsistency exists between a bench decision and a jury verdict on different claims arising out of the same transaction, the jury finding must take precedence in the Seventh Amendment context[.]"   Perdoni Brothers, Inc. v. Concrete Systems, Inc., 35 F.3d 1, 5 (1st Cir. 1994).

During the pretrial conference held on October 13, 2015, SMRI proposed instructions on estoppel as an equitable defense.   See Docket 187 at pp. 25-27. The proposed instructions focused on SMRI's claim that because the RPG defendants were a licensee of SMRI's predecessor Sturgis Motorcycle Rally in 1999, the defendants could not assert an estoppel defense.   Id.   "Sturgis

Motorcycle Rally asserts that the RPG Defendants may not challenge the validity of its STURGIS RALLY & RACES trademark and STURGIS Composite Design Mark because they sought and received a license to use those marks in 1999." Id. at p. 26.   Plaintiff's counsel claimed the 1999 license barred the RPG defendants from contesting the STURGIS RALLY & RACES mark or the STURGIS portion of the Composite Design Mark.   Plaintiff argued "our opponents have even briefed they think Sturgis Rally & Races is the same mark as Sturgis, so we think they should be estopped."   (Docket 214 at p. 228:6-8).

The court concluded plaintiff's estoppel defense should be taken up at the close of plaintiff's evidence.   "It seems to me that I may get to the point either at the conclusion of all the evidence or the conclusion of the plaintiff's evidence where if you wish to raise an equitable defense, I will take it up."   Id. at pp. 229:22-230:1.   Plaintiff's counsel responded, "I understand what the Court is doing.   We would—to the extent there are issues the jury needs to decide, we would continue to move and hold that these instructions should be included for the jury's consideration. . . . [I]f not included, now could be included as supplemental instructions."   Id. at pp. 230:4-11.   The court then refused plaintiff's proposed instructions.[8]   Id. at p. 230:16-20.

---

[8]During the settlement of supplemental instructions at the close of the evidence, the court again refused plaintiff's proposed instruction on licensee estoppel.   (Docket 318 at pp. 176:22-179:25).

Defendants' equitable defenses of estoppel and acquiescence came up during the pretrial conference in the context of a motion *in limine* regarding witness intimidation.   During the discussion on that motion, plaintiff's counsel acknowledged the RPG defendants' equitable defenses: "[O]ur client has an obligation to enforce marks subject to defendants' estoppel and acquiescence . . . ."   Id. at p. 67:15-17.   The court ruled the defendants' equitable defenses would be resolved after the jury trial on the parties' other claims.   Id. at pp. 229:21-230:1.

During the course of trial, the RPG defendants moved for judgment as a matter of law pursuant to Rule 50(a) on their equitable defense of acquiescence as to plaintiff's "Sturgis Bike Week" claim.   (Docket 318 at pp. 264:23-266:1). The court denied the motion, but invited the RPG defendants to file "a post trial motion in the event there's a verdict that would be impacted by this equitable matter" and the court would "certainly entertain [the motion] again."   Id. at pp. 268:23-269:2.   The court reiterated its position: "I am not going to take [plaintiff's trademark claim as to "Sturgis Bike Week"] away from the jury on the basis of acquiescence.   But if you wish to reurge it, I will look at it."   Id. at p. 269:7-9.

During the Rule 50(a) motion hearing, the court addressed the RPG defendants' equitable defense of laches.   The RPG defendants argued:

> This theory applies when a claimant inexcusably delays in asserting its claim and unduly prejudices the party against whom the claim ultimately is asserted.   The defendants have to prove three

elements here and in order to successfully assert laches as a defense, first there is delay in the asserting a right or claim.   Two, that the delay was not excusable.   And three, that there was undue prejudice to the party against whom the claim was asserted. . . .

The evidence is at the point of sales using Sturgis, Sturgis Rally, Sturgis Motor Classic has been open and notorious for decades. There were sales to the chamber, there were sales to Black Hills Rally & Gold, there were sales to Good Sports, sales to Sturgis Motorcycles; the sales by my client has been there for a long, long time.   And the plaintiff and their predecessors-in-interest sat on their rights to the detriment of my client, so we believe there's sufficient and ample evidence to warrant a judgment as a matter of law on the issue of laches, and that applies to the registered and unregistered marks as well.

Id. at pp. 269:11-20 and 270:3-14.   The court denied the Rule 50(a) motion.

I don't see laches finding a foundation in the evidence in this case. This is an ongoing and evolving set of circumstances giving rise to the claims that are all being litigated here.   And various parties and predecessors-in-interest took strong action either on unregistered marks that were an effort to register various times for various marks. . . . I think the whole matter comes down to a dispute as to who, what, when.   And under those circumstances, laches would not be an appropriate equitable concept to apply, so I deny that.

Id. at pp. 271:17-272:2.

In post-trial briefing under Rule 52(b), the RPG Defendants now argue the "[u]ndisputed testimony and evidence established that [they] sold merchandise bearing the accused designations to Plaintiff's predecessors-in-interest, Sturgis Bike Week, Inc., and the Sturgis Area Chamber of Commerce, at least as early as the 2000s.   These predecessors then resold the RPG product.   Neither predecessor objected to RPG's sales or asserted that the goods were infringing any trademark."   (Docket 352 at p. 2).   The defendants also argue "RPG's sale of

39

its Sturgis product line in the marketplace was open and notorious for over two decades before suit was filed in 2011. . . . RPG not only sold to Plaintiff's predecessors but also to closely affiliated businesses."   Id.

The RPG defendants assert SMRI and its predecessor-in-interest, the Sturgis Chamber, have not presented any "justification for the delayed assertion of trademark rights."   Id.   Over the period of two decades, the RPG defendants claim they "built a Sturgis product line for its numerous clients, [and] have been unduly prejudiced by Plaintiff's undue delay in asserting trademark infringement."   Id. at p. 3.   The defendants submit that "[b]ecause substantial evidence supports [their] defenses of acquiescence and laches, the Court should grant Defendants' motion for findings and conclusion[s] on their equitable defenses and issues."   Id. at p. 14.

Plaintiff resists the defendants' motion on several grounds.   (Docket 371). First, SMRI claims defendants' Rule 52(b) motion is untimely and the defendants did not file a brief in support of the motion in violation of Fed. R. Civ. P. 7(b)(1) and D.S.D. Civ. LR 7.1(B).   Id. at 2.   Plaintiff argues "[t]he Court should deny this untimely, procedurally-improper motion."   Id. at p. 1.

For the same reasons articulated when addressing SMRI's challenge to defendants' Rule 50(b) motion, plaintiff's motion is without merit.   Plaintiff's motion to dismiss the defendants' Rule 52 motion as untimely is denied.

SMRI argues the RPG defendants failed to "first . . . move for judgment as a matter of law under Rule 50(a) and, if necessary, to ask the Court to send the

40

issue to the jury[.]"   (Docket 371 at p. 3).   SMRI acknowledges the defendants

moved for judgment as a matter of law under Rule 50(a) as to the defense of

laches and that the court denied the motion.   Id. at p. 4.   But SMRI claims the

RPG Defendants did not move for judgment as a matter of law under Rule 50(a)

as to the equitable defense of acquiescence.   Id.   SMRI's argument is without

merit.

Immediately prior to defendants' Rule 50(a) motion on laches, the

defendants moved "for judgment as a matter of law [on] the Equitable Doctrine of

Acquiescence."   (Docket 318 at p. 264:23-24).   The motion related "to the

Sturgis Bike Week registration number 2070955, which is the 1984 registration.

This relates back to SMR[I]'s predecessor-in-interest, Sturgis Bike Week,

Incorporated."   Id. at pp. 264:25-265:3.   The court denied the motion, but

invited the defendants to reurge their equitable motions after trial.

Id. at pp. 268:24-269:9.   Plaintiff's request to dismiss the defendants' Rule 52

motion on the basis of procedural default is denied.

SMRI's third basis for asking the court to deny defendants' Rule 52(b)

motion on laches is based on its own equitable defense of unclean hands.[9]

(Docket 371 at p. 5).   SMRI argues defendants' laches defense must fail because

the jury found defendants' conduct "to be willful or intentional."   Id.   Plaintiff

argues "[b]ecause unclean hands is an equitable defense, [SMRI] can bar the

---

[9]SMRI asserted unclean hands as an affirmative defense to defendants'
equitable claims.   (Docket 58 at p. 9 ¶ 5).

assertion of another equitable defense, such as acquiescence and laches."   Id. (citing 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:44 (4th ed.)).

Next, SMRI alleges the RPG Defendants cannot show prejudice because they have not proved they changed their business position in a different way had SMRI not delayed in asserting its trademark claims.   Id.   Rather, SMRI argues the RPG Defendants "changed their strategy in 2007 to mark their goods as 'official' and 'licensed[.]' "   Id. at p. 6.   SMRI asserts because Brian Niemann, a RPG corporate officer, directed this strategy and the defendants continued to sell infringing goods during this litigation, the RPG Defendants cannot claim prejudice.   Id. at p. 7.

Finally, on the equitable defense of acquiescence, SMRI argues the defendants "introduced no evidence that anyone with Sturgis Bike Week, Inc., had knowledge of the goods being placed on [its] shelves by Rushmore. . . . Moreover, neither SMRI nor its predecessor-in-interest, the Sturgis Chamber, acquiesced in any conduct of Sturgis Bike Week, Inc., an organization against which the Sturgis Chamber was engaged in a trademark dispute until those claims were settled in 2009 and the Sturgis Chamber acquired the STURGIS BIKE WEEK mark and related intellectual property."   Id. at p. 8.

In response to SMRI's arguments, the RPG Defendants assert "[w]hen viewed in its totality, the now undisputed evidence before the Court weighs in favor of barring Plaintiff's claims."   (Docket 385 at p. 2).   The defendants argue

that "[f]or well over six years preceding this suit, Plaintiff's predecessors-in-interest to the Sturgis Bike Week and STURGIS marks consented to the very behavior that Plaintiff now claims is infringement by purchasing products from RPG bearing the now accused designations.   Plaintiff did not dispute this at trial and has not done so in its response."   Id.   Defendants claim SMRI "provided no explanation for the delay in bringing suit, during which RPG invested substantial effort and money in developing its Sturgis rally-related product lines."   Id. Defendants submit SMRI does not dispute that for "over ten years before it sued RPG, Sturgis Bike Week, Inc., purchased and resold in its own stores numerous products bearing the now accused Sturgis Motor Classic designation."   Id. at p. 3.   For these reasons, the defendants assert that SMRI's "trademark infringement related to the Sturgis Bike Week registrations are barred by the equitable defense of acquiescence."   Id. at p. 4.

Addressing the STURGIS marks, the defendants argue SMRI "does not dispute that the Sturgis Area Chamber of Commerce . . . its predecessor-in-interest to the STURGIS marks, sold RPG's products as early as 2003. . . . [SMRI] also does not dispute that RPG has sold products bearing the accused designations to board members and licensees of the Chamber in addition to its own board members and licensees[,] [including] Black Hills Rally & Gold . . . [and] Black Hills Harley . . . ."   Id. at p. 5.   The defendants claim SMRI "ignores Paul Niemann's testimony that RPG sold products to the Chamber that bore the name 'Sturgis' as far back as the 1990s."   Id. (references omitted).   During the

43

ten-year time period before SMRI brought suit in 2011, the RPG Defendants argue the evidence shows they "invested substantially in the Sturgis product line for its numerous clients, sold millions of dollars in Sturgis rally-related products, and filed for state trademark registrations related to its Sturgis line, which Plaintiff seeks to nullify."   Id. at p. 7 (references omitted).

The RPG Defendants argue the "8-12 years of acquiescence to RPG's use of the marks by Plaintiff's predecessors-in-interest likely contributed to the jury's willfulness finding."   Id. at p. 8.   "To foreclose the laches and acquiescence defenses," the defendants argue SMRI "must offer something more than mere objective evidence to demonstrate that the defendant employed the allegedly infringing mark with the wrongful intent of capitalizing on [the mark's] goodwill." Id. at pp. 8-9 (citing Abraham v. Alpha Chi Omega, 796 F. Supp. 2d 837, 846 (D. Tex. 2011) (internal quotation marks and additional citation omitted).

1.   WAS A QUESTION OF FACT ON A LEGAL CLAIM RESOLVED BY THE JURY SUCH THAT THE JURY'S FINDING IS BINDING ON THE COURT IN RESOLVING DEFENDANTS' EQUITABLE DEFENSES?

Because the jury found the defendants' conduct "willful" and "intentional," plaintiff argues the answer to this question is "yes," the court should be bound by the jury finding.   (Docket 371 at pp. 4-6).   The RPG Defendants state the issue in the negative: "It is clear . . . not all factual issues related to the equitable defenses of acquiescence and laches are required to be submitted to the jury, only those that are common to the legal claims."   (Docket 385 at p. 8) (referencing Lytle v. Household Manufacturing Co., 494 U.S. 545, 550 (1990)

44

("When legal and equitable claims are joined in the same action, the right to jury trial on the legal claim, including all issues common to both claims, remains intact.") (internal quotation marks and citation omitted).   The defendants assert SMRI "fails to point out any such common issues that were improperly withheld." Id.

ACQUIESCENCE

The critical time period relevant to the jury's consideration of plaintiff's legal claims is from 2006 through 2015.   On behalf of SMRI, a cease and desist letter was served on Paul Niemann and Carol Niemann dated August 8, 2006. (Exhibit 52).   Plaintiff's complaint was not filed until June 22, 2011.   (Docket 1).   There was no evidence presented at trial or now offered by SMRI indicating the reasons, if any, why plaintiff waited 4 years and 10 months to initiate litigation to protect SMRI's trademark claims.

The RPG Defendants assert their equitable defense of acquiescence in the use of the Sturgis Bike Week marks began "at least as early as the 2000s." (Docket 352 at p. 2).   Defendants also contend that for "over ten years before [SMRI] sued RPG, Sturgis Bike Week, Inc., purchased and resold in its own stores numerous products bearing the now accused Sturgis Motor Classic designation."   (Docket 385 at p. 3).   See also Docket 318 at pp. 264:25-265:3 (the acquiescence defense relates "to the Sturgis Bike Week registration number 2070955, which is the 1984 registration.   This relates back to SMR[I]'s predecessor-in-interest, Sturgis Bike Week, Incorporated.").

45

The court finds the following trial evidence relevant to the equitable defense of acquiescence:

1.    The STURGIS BIKE WEEK registration was owned by Sturgis Bike Week, Inc., [Virginia Rhodes] since June 17, 1997. (Exhibits 1 at p. 7 and 19 at p. 4).

2.    Brian Niemann, an officer and employee of RPG, testified that Sturgis Bike Week, Inc., conducted business with RPG from at least 1999 through 2009. (Docket 316 at pp. 33:9-34-1).

3.    RPG sold Sturgis Bike Week, Inc., products bearing the "Sturgis Motor Classic" mark, including shot glasses, key chains, magnet lanyards, head wraps and bandanas.   Id. at p. 33:12-19.

4.    Sturgis Bike Week, Inc., resold these products through its own retail store.   Id. at p. 33:20-34:1.

5.    Sturgis Bike Week, Inc., never complained to RPG about the use of "Sturgis" or "Sturgis Motor Classic" on rally products. Id. at p. 34:2-13.

6.    During the 1999-2009 time period, RPG continued to grow and develop its inventory and marketed "Sturgis" and "Sturgis Motor Classic" rally products.   Id. at pp. 28:2-29:10.

7.    The STURGIS BIKE WEEK registrations were not assigned to the Sturgis Chamber and then SMRI until 2010 and 2011, respectively.   (Exhibit 1 at pp. 8-12 and Exhibit 19 at pp. 4-6).

The critical time period for the defendants' acquiescence defense is 1999 through 2009.   The jury made no finding of fact on any element of defendants' equitable defense of acquiescence.   The court is free to resolve whether defendants' acquiescence defense is applicable to plaintiff's claims.

SMRI's claim that no one at Sturgis Bike Week, Inc., had any knowledge of the products being placed on the shelves of Sturgis Bike Week, Inc.'s, retail store by RPG is without merit.   On behalf of RPG, Brian Niemann testified as to what products were being sold to Sturgis Bike Week, Inc.   His testimony was unchallenged and it is incomprehensible that for over 10 years no one at Sturgis Bike Week, Inc., would have knowledge of these rally products being purchased at wholesale from RPG and then being resold at retail in its own store.   The court finds the testimony of Brian Niemann credible on these matters.

By purchasing "Sturgis" and "Sturgis Motor Classic" items from RPG and then reselling them through its own retail locations, Sturgis Bike Week, Inc., expressly or impliedly represented that it would not assert a right or exclusive claim to use those terms.   Sturgis Bike Week, Inc., acquiesced to RPG's use of "Sturgis" and "Sturgis Motor Classic" during the time period before Sturgis Bike Week, Inc., assigned "Sturgis Bike Week" to the Sturgis Chamber and ultimately to SMRI.   Minnesota Mining & Mfg. Co., 2001 WL 530551, at *7 ("an infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement.").

The final element requiring resolution before the court may apply an acquiescence defense is that the defendants must show a "change in position based [on plaintiff's conduct] to [defendants'] injury, detriment or prejudice." Id. at WL 530551, at *8 (reference omitted).   Over the 1999-2006 time period the

47

RPG defendants continued to build its Sturgis product line and market to its customers, including Sturgis Bike Week, Inc., the Sturgis Chamber, Black Hills Harley, Good Sports, and Black Hills Rally & Gold.   RPG expanded its employee workforce from only family members to 20 employees in 2015 and invested heavily in its Sturgis-related rally products.   (Docket 315 at p. 70:4-19; 71:8-15; 811:3-19; 816:16-20; 203:14-204:15; 207:24-209:2; Trial Exhibit 74a).   The evidence shows it was more probable than not had Sturgis Bike Week, Inc., and the Sturgis Chamber asserted their rights back in 1999 or shortly thereafter, the growth and expansion by the RPG defendants would not have occurred to the extent it did.   Hubbard Feeds, Inc., 182 F.3d at 602 ("The defendant spent large sums in reliance upon its apparent immunity . . . . When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of business to stop its use . . . .") (internal citations omitted).   The RPG defendants have shown significant prejudice.   Id.

The RPG Defendants' equitable defense of estoppel by acquiescence is a meritorious defense to SRMI's trademark claims.

LACHES

As to the use of the STURGIS mark, the RPG Defendants assert the equitable defense of laches because the use of their STURGIS marks was "open and notorious for over two decades before suit was filed in 2011. . . ."   (Docket 352 at p. 2).

48

Again, the time period 2006-2015 is the critical period relevant to the jury's consideration of plaintiff's legal claims.   Relevant to defendants' laches defense, the Sturgis Chamber sent a cease and desist letter to the RPG defendants on August 8, 2006.   (Trial Exhibit 52).   The letter demanded the RPG defendants "discontinue the use of the terms, 'Sturgis Motor Classic," and "Officially Licensed Sturgis™ Products" because the Sturgis Chamber owned what it called the "STURGIS Logo."   Id. at pp. 1-2.   The letter claimed the STURGIS Logo had been owned as Registration No. 1,948,097 since January 16, 1996.   Id. at p. 2.

While that statement is true as it relates to the Composite Design Mark, SMRI's suggestion that registration for STURGIS had been approved was not true and was deceptive.   In fact, the "STURGIS Logo" was the Composite Design Mark.   Id.   The Composite Design Mark registration specifically acknowledged that it made "no claim . . . to the exclusive right to use 'MOTOR CLASSIC' or 'RALLY & RACES BLACK HILLS S.D.' apart from the mark as shown."   (Exhibit 1 at p. 6) (some capitalization omitted).

As the evidence at trial disclosed, the Sturgis Chamber filed for trademark registration for STURGIS on January 30, 2001.   (Trial Exhibit 769 at DEFS 000607-17.)   At that time, the STURGIS Registrations No. 1,260,886 and 1,959,099 were owned by H-D Michigan and used through its licensee, Harley-Davidson Motor Company.   Id. at DEFS 000544 and 000580.   After the Sturgis Chambers' registration for STURGIS was published for opposition on October 15,

2002, Good Sports Sturgis, Inc. ("Good Sports") and Sturgis Motorcycles, d/b/a Black Hills Harley-Davidson ("Black Hills Harley") filed oppositions to the proposed registration.   (Trial Exhibits 538 and 539).   The Patent and Trademark Office had not resolved the Sturgis Chambers' application for registration as of August 2006.   This was and remained the status of the Sturgis Chambers' application until it was transferred to SMRI and the STURGIS registration was issued to SMRI on February 22, 2011.   (Trial Exhibit 1 at p. 2).

The court finds the following evidence presented at trial relevant to the equitable defense of laches:

1.      Paul Niemann, an officer and employee of RPG, testified his company sold "Sturgis" rally products to the Sturgis Chamber as far back as the 1990s.   (Docket 315 at p. 114:3-8.).   At no time did the Sturgis Chamber complain to RPG about the use of the "Sturgis" mark.   Id. at p. 115:10-19.

2.      RPG sold "Sturgis" rally products to Black Hills Harley, a founding member of SMRI, "since the early '80s.' "   Id. at pp. 91:23-92:2; see also Trial Exhibit 727.[10]   Sales continued in the 1990s.   (Docket 315 at p. 113:17-21).   Black Hills Harley then resold those products at retail.   Id. at p. 92:3-4.   Black Hills Harley never complained about the use of the "Sturgis" mark to RPG.   Id. at pp. 92:3-4; 115:10-19.

3.      RPG sold "Sturgis" rally products to Mr. Berkowitz, a founding member of SMRI and its principal licensee, and his companies Good Sports and Hot Leather in the 1990s and those companies in turn sold the RPG products at retail.   Id. at pp. 91:23-92:4; 113:22-24; see also Docket 313 at p. 64:7-10

---

[10]Jim Burgess, an owner of Black Hills Harley, was a member of the board of directors of SMRI at the time of its incorporation in 2010.   (Trial Exhibit 727 at p. 2).

and Trial Exhibit 727.[11]   Mr. Berkowitz and his companies never complained to RPG about RPG's use of the "Sturgis" mark.   (Docket 315 at p. 92:10-19).

4.   RPG sold "Sturgis" rally products to Black Hills Rally & Gold, now a major SMRI licensee, in the 1990s.   Id. at pp. 113:25-114:2.   Black Hills Rally & Gold never complained about the use of the "Sturgis" mark to RPG.   Id. at p. 115:10-19.

5.   From the 1990s through the 2000s RPG continued to grow and develop its inventory and marketed "Sturgis" rally products.   Id. 315 at pp. 113:9-115:19

The court finds the testimony of Paul Niemann credible on these matters.

The jury made no finding of fact on any element of defendants' equitable defense of laches.   The court is free to resolve whether defendants' laches defense is applicable to plaintiff's claims.

The court finds SMRI and its predecessor-in-interest the Sturgis Chamber inexcusably delayed asserting a trademark infringement claim against the RPG defendants.   Hubbard Feeds, Inc., 182 F.3d at 602.

After the cease and desist letter of August 8, 2006, RPG continued to engage in the sale of "Sturgis" rally products in the good-faith belief that the term "Sturgis" was generic.   Over the relevant time period, the RPG defendants continued to market its Sturgis product line to its customers, including the Sturgis Chamber, Black Hills Harley, Good Sports, and Black Hills Rally & Gold. RPG expanded its employee workforce from only family members to 20

---

[11]Mr. Berkowitz was a member of the board of directors of SMRI at the time of its incorporation in 2010.   (Trial Exhibit 727 at p. 2).

employees in 2015 and invested millions of dollars in its Sturgis-related rally products.   (Docket 315 at p. 70:4-19; 71:8-15; 811:3-19; 816:16-20; 203:14-204:15; 207:24-209:2; Trial Exhibit 74a).   Until the filing of the complaint, the Sturgis Chamber, its successor-in-interest SMRI, and their major business members never asserted a claim of ownership to STURGIS, Sturgis Motor Classic or the "Officially Licensed Sturgis™ Products" then being produced and marketed by the RPG Defendants.   The jury's finding that the term "Sturgis" is not generic does not change the court's finding that RPG's belief that "Sturgis" was generic was a belief held in good faith.

Until the jury resolved that issue on October 30, 2015, major players in the Sturgis business community believed STURGIS was generic and could not be trademarked.   Rod Woodruff is an attorney and the owner of the Buffalo Chip Campground ("Buffalo Chip") at Sturgis, South Dakota.   (Docket 317 at p. 43:10-23).   Back in the 1980s the Buffalo Chip was using the term Sturgis Rally to promote the rally.   Id. at p. 45:9-14.   In 1982, posters promoting the rally "were distributed all around. . . . Mobridge and Chamberlain . . . They were distributed widely."   Id. at pp. 45:21-46:1.

The Buffalo Chip has been promoting the Sturgis rally since 1982.   Id. at p. 46:4-7.   Mr. Woodruff purchased the Buffalo Chip in 1986.   Id. at p. 46:23-25.   In 1987, the Buffalo Chip "started using . . . the phrase Sturgis Rally."   Id. at p. 46:10-12.   In about 1999, the Buffalo Chip began using the phrase Sturgis Bike Week.   Id. at p. 47:10-11.

The Buffalo Chip covers approximately 600 acres and during the rally it hosts "one of the largest music festivals in the country."   Id. at p. 50:10-17. During the rally there are approximately 500 employees working to entertain between 10,000 and 20,000 rally attendees each day.   Id. at pp. 50:21-24; 53:8-14.   The Buffalo Chip incurs significant promotional costs for the rally each year in magazines, radio, television and other marketing formats.   Id. at pp. 56:22-57:7.   For the 2015 rally, the Buffalo Chips' marketing budget was "over $400,000 a year." Id. at p. 57:8-15.

Throughout this entire time period, the Buffalo Chip never sought a license to use Sturgis in its marketing activities.   Id. at p. 60:7-14.   The Sturgis Chamber would call Mr. Woodruff and ask him to bring the Buffalo Chip promotional materials to the Chamber for distribution.   Id. at p. 60:14-17. Outside vendors selling Sturgis products were located at the Buffalo Chip.   Id. at p. 61:1-62:14.

The Buffalo Chip owns a trademark for the name "Sturgis Buffalo Chip." Id. at p. 65:7-12.   Because Mr. Woodruff believed the word Sturgis was generic, his company disclaimed any right to the exclusive use of the word Sturgis.   Id. at p. 65:19-24.   During the Fiftieth Anniversary of the Sturgis Rally in 1990, one of the Buffalo Chip sponsors, Finlandia Vodka Company, developed rally patches which said "Sturgis Rally Buffalo Chip."   Id. at p. 70:16-23; see also Trial Exhibit 797 at pp. 1-2.   Buffalo Chip Sturgis Rally t-shirts and poker chips were sold over the years.   See Trial Exhibits 792, 787 and 787a.   "Tens of

thousands" of the poker chips were distributed during the 1990 rally.   (Docket 317 at p. 79:5-7).

Mr. Woodruff was on the SMRI board of directors for a few weeks in early 2011.   Id. at 6-21.   He resigned because SMRI was asserting ownership of the word "Sturgis."   Id. at pp. 88:4-89:14.

Jerry Berkowitz's sworn declaration to the Patent and Trademark Office in 2002 in opposition to the Sturgis Chamber's application to register STURGIS stated:   "Good Sports has continuously used the name Sturgis and commerce on or in connection with the same of rally products.   And rally product is a bunch of different categories including T-shirts, bandanas, and jewelry, held in and around Sturgis in the Black Hills area of South Dakota each year since at least 1985."   (Docket 314 at pp. 108:22-109:5); see also Trial Exhibit 538.   He declared "Goods Sports has continuously used the name Sturgis in the promotion of the rally since at least 1985. . . . Good Sports' use of the name Sturgis in the sale of rally products at the rally has been through the same channels of trade, the same class of customers as rally products offered by the chamber."   (Docket 314 at p. 109: 8-19).   His declaration also stated that Good Sports "had gross sales of rally products bearing the name Sturgis totaling 2.6 million [dollars] since 1987."   Id. at p. 110:5-7.

Mr. Berkowitz's declaration said "that many of over 700 vendors used the name Sturgis in connection with the sale of rally products each year at the rally." Id. at p. 110:8-11.   In 2002, Mr. Berkowitz believed "the name Sturgis was

primarily geographically descriptive when used on or in connection with rally products and services." Id. at p. 112: 4-10.

The sworn declaration in 2002 by Jim Doyle, Vice President of Sturgis Motorcycles, Inc., d/b/a Black Hills Harley-Davidson, to the Patent and Trademark Office in opposition to the Sturgis Chamber's application to register STURGIS stated: "Sturgis Motorcycle and its predecessors have continuously used the name STURGIS in commerce in connection with the promotion of the Rally including organizing and sponsoring events at the Rally since at least 1991." (Trial Exhibit 539 at p. 6 ¶ 2). Mr. Doyle stated "Sturgis Motorcycles has gross sales of Rally Products totaling approximately $12.6 million sold in connection with the name STURGIS since the year 2000." Id. at p. 7 ¶ 8. His opposition statement reaffirms the testimony of Brian Niemann, Paul Niemann, Rod Woodruff and Jerry Berkowitz: "Many of over 700 vendors use the name STURGIS in connection with the sale of Rally Products each year . . . [and] in connection with the promotion of the Rally." Id. at p. 8 ¶¶ 11-12.

The evidence shows it was more probable than not had the Sturgis Chamber and SMRI asserted those rights back in 2006 or shortly thereafter, the massive investment in and expansion of Sturgis rally lines by the RPG defendants would not have occurred to the extent it did. Hubbard Feeds, Inc., 182 F.3d at 602 ("The defendant spent large sums in reliance upon its apparent immunity . . . . When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of business to stop its use

55

. . . .") (internal citations omitted).   The RPG defendants have shown significant

prejudice.   Id.

UNCLEAN HANDS

SMRI claims because the jury found the RPG Defendants' conduct "willful"

and "intentional," the defendants have "unclean hands," which defeats their

laches defense.   (Docket 371 at pp. 5-7).   Regarding each of SMRI's trademark

claims, the jury made the following findings:

STURGIS          Defendants engaged in "willful[12] and intentional"[13]
                 infringement, but their "Sturgis Designations"[14]
                 were not a counterfeit[15] of SMRI's mark.   (Docket
                 263 at p. 2);

TAKE THE RIDE TO STURGIS      Defendants did not infringe on the
                 mark.   Id. at p. 4;

STURGIS BIKE WEEK    Defendants engaged in "willful and
                 intentional" infringement, but their
                 "Sturgis Designations" were not a
                 counterfeit of SMRI's mark.   Id. at pp. 6-7;

---

[12]"Willfully" was defined in the court's instructions as acting "with the
conscious intent to benefit from the goodwill or reputation of SMRI's trademark."
(Docket 235 at p. 61).

[13]"Intent" was defined in the court's instructions as a "[k]nowing use by a
defendant of SMRI's mark to identify similar products may strongly show an
intent to derive benefit from the reputation of SMRI's mark, suggesting an intent
to cause a likelihood of confusion."   (Docket 235 at p. 32 ¶ 4).

[14]Defendants' "Sturgis Designations" included: "Officially Licensed
Sturgis," "Authentic Sturgis," "Legendary Sturgis," "Licensed Sturgis," "Official
Sturgis," "Sturgis Central," "Sturgis Motor Classic" and "Sturgis Rally."   (Docket
235 at p. 31).

[15]"A 'counterfeit' is a false or fake mark which is identical with, or
substantially indistinguishable from, a registered mark."   (Docket 235 at p. 33).

| | |
|---|---|
| Composite Design Mark | Defendants engaged in "willful and intentional" infringement and their "Sturgis Designations" were a counterfeit of SMRI's mark.   Id. at pp. 7-8; |
| STURGIS MOTORCYCLE RALLY | Defendants engaged in "willful and intentional" infringement.   Id. at p. 9; |
| STURGIS RALLY & RACES | Defendants engaged in "willful and intentional" infringement.   Id. at p. 10; |

The remainder of SMRI's claims were driven by the jury's resolution of SMRI's trademark infringement claims.   (Dockets 235 at pp. 36-41; 43-56 and 263 at pp. 14-17).

Brian Niemann conceded at trial that RPG used "Sturgis" on its rally products.   (Docket 316 at p. 34:17-19).   He testified he believed "Sturgis" was a generic term used by everyone in the rally industry.   Id. at p. 34:22-25.   Based on his testimony and RPG's continuous use of the "Sturgis" mark for the preceding 10-15 years, the jury found the RPG Defendants willfully acted with a conscious intent to benefit from the STURGIS marks and the goodwill of those marks.

SMRI presented sufficient evidence to permit the jury to find the RPG Defendants' "conduct created a likelihood of confusion as to the source, sponsorship, or affiliation of [defendants'] . . . products."   Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145, 150 (5th Cir. 1985).   SMRI now asks the court to conclude the defendants used the STURGIS marks "with the explicit bad

faith intent of 'passing off' [their] . . . product[s] as emanating from or endorsed by" SMRI.   Id.   "Passing off may be found only where the defendant 'subjectively and knowingly" intended to confuse buyers."   Id.

The evidence at trial does not support such a finding.[16]   After 2006, the RPG Defendants specifically employed its own labels and tags to differentiate their products from SMRI's products.   See, *i.e.*, Trial Exhibits 239 and 276a. Those labels confirmed the products were a "STURGIS MOTOR CLASSIC" product and "not affiliated with, sponsored or endorsed by SMRI."   Id.

Defendants' conduct does not rise to the level of "unclean hands" so as to defeat the RPG Defendants' right to assert laches.

> [A] defendant's mere awareness of a plaintiff's claim to the same mark . . . [does not] establish[] the bad intent necessary to preclude the availability of the laches defense. . . . The plaintiff's burden, therefore, is heavy.   To foreclose the laches and acquiescence defenses, the plaintiff must offer something more than mere objective evidence to demonstrate that the defendant employed the allegedly infringing mark with the wrongful intent of capitalizing on its goodwill.

Conan Properties, Inc., 752 F.2d at 150 (internal citation omitted).

The court finds "[t]he jury's finding of trademark infringement and unfair competition did not constitute a finding that [defendants] acted with the wrongful intent to capitalize on [SMRI's] goodwill, since wrongful intent is merely one of . . . seven critical elements contributing to a finding of likelihood of confusion."   Id. at 151; see also Docket 235 at pp. 31-33 (Instruction No.

---

[16]The jury was not asked to determine whether defendants' conduct was "passing off" conduct.   See Docket 235.

21—Likelihood of Confusion).   The record is clear the defendants intended to use the STURGIS marks, but "sufficient doubt exits regarding whether that use was designed to capitalize on [SMRI's] good-will."   Conan Properties, Inc., 752 F.2d at 151.   "A showing that the defendant intended to use the allegedly infringing mark . . . may give rise to a presumption that the defendant intended to cause public confusion as to the source . . . of the product . . . . The same showing, however, does not give rise to a presumption that the defendant intended to appropriate the plaintiff's goodwill from [defendant's] use of the allegedly infringing mark."   Id. at 151 n.2.

The court finds the defendants were subjectively intending to differentiate their products from SMRI's products and not confuse buyers.   Id. at 150.   The court further finds "[t]he record . . . fails to reveal the subjective and knowing bad faith necessary to foreclose the equitable defenses."   Id. at p. 151.   SMRI "has not carried its burden of proving that [defendants] subjectively and knowingly intended to use [their marks] for purpose of deriving benefit from [SMRI's] goodwill."   Id.   RPG built its own goodwill with its wholesale customers and consumers.   That goodwill was the basis of RPG's continuing use of its Sturgis designations in expanding its business over decades.

The RPG Defendants' equitable defense of laches is a meritorious defense to SRMI's trademark claims.

2.     WHAT REMEDY ARE THE RPG DEFENDANTS ENTITLED TO BY
       THE APPLICATION OF THE EQUITABLE DEFENSES?

To determine whether laches constitutes a defense to permanent

injunctive relief, "the court should weigh the competing equities which bear on

the issue of delay and should then grant or deny injunctive relief depending on

the overall balance of those equities."  6 J. Thomas McCarthy, *McCarthy on*

*Trademarks and Unfair Competition,* § 31:6 (4th ed.) (citations omitted).   But

see, Menendez v. Holt, 128 U.S. 514, 523 (1888) ("The intentional use of

another's trade-mark is a fraud; and when the excuse is that the owner

permitted such use, that excuse is disposed of by affirmative action to put a stop

to it.   Persistence, then, in the use is not innocent, and the wrong is a

continuing one, demanding restraint by judicial interposition when properly

invoked.   Mere delay or acquiescence cannot defeat the remedy by injunction in

support of the legal right, unless it has been continued so long, and under such

circumstances, as to defeat the right itself."); San Francisco Association for the

Blind v. Industrial Aid for the Blind, 152 F.2d 532, 537 (8th Cir. 1946) ("The

delay of plaintiff [eight years] in bringing this action will not prevent the issuance

of an injunction against further infringement, but will, under the circumstances

of this case, deprive the plaintiff of any right to damages or an accounting.")

(referencing Menendez, 128 U.S. at 523-25); Grotrian, Helfferich, Schulz, Th.

Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1344 (2d Cir. 1975) (court

vacated money damages but affirmed permanent injunction to prevent further

infringement); Minnesota Mining and Manufacturing Co. v. Beautone

Specialties, Co., Ltd., 82 F. Supp. 2d 997, 1005 (D. Minn. 2000) (in addressing a

summary judgment motion, the court concluded a 12-year delay bars damages

for the period prior to suit, but not a permanent injunction).

The court finds the defendants' equitable defenses foreclose SMRI's right

to recover money damages prior to the October 30, 2015, jury verdict finding that

SMRI holds a valid, registered trademark for STURGIS.   San Francisco

Association for the Blind, 152 F.2d at 537; Grotrian, Helfferich, Schulz, Th.

Steinweg Nachf., 523 F.2d at 1344; and Minnesota Mining and Manufacturing

Co., 82 F. Supp. 2d at 1005.   Until the jury found in favor of SMRI, the

defendants' good faith belief that the Sturgis Chamber and its

predecessor-in-interest, Sturgis Bike Week, Inc., acquiesced in defendants' use

of the STURGIS marks in combination with defendants' good faith belief that

STURGIS was generic, the trademark issue was unresolved.   These factors

"under the circumstances of this case, deprive the plaintiff of any right to

damages . . . ."   San Francisco Association for the Blind, 152 F.2d at 537.   See

also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., 523 F.2d at 1344 (because

of the 10-year delay in asserting a trademark claim, "[u]nder such circumstances

there was an abandonment of any claim for monetary relief, notwithstanding

[defendant's] deliberate infringement.").

"The general rule is that a finding of laches bars a plaintiff's ability to

recover for past wrongs, but not a plaintiff's ability to obtain relief for continuing

violations." Minnesota Mining and Manufacturing Co., 82 F. Supp. 2d at 1005

(referencing A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d

1020, 1040 (Fed. Cir. 1992) (*en banc*)).   "[T]he public interest in stopping . . . an

ongoing violation of the trademark laws" is an important factor to consider.   Id.

Permanent injunctive relief is appropriate to avoid and prevent the "continuing

risk that the public will be confused by the defendants' use of [their marks]."

Minnesota Mining and Manufacturing Co., 82 F. Supp. 2d at 1005.

SMRI owns registered trademarks for STURGIS®, STURGIS BIKE WEEK®,

and BLACK HILLS MOTOR CLASSIC STURGIS RALLY & RACES BLACK HILLS S.D.®

and the unregistered marks STURGIS MOTORCYCLE RALLY™ and STURGIS RALLY

& RACES™.   (Docket 299 at p. 4).   On February 11, 2016, the court entered a

preliminary injunction prohibiting the defendants from using SMRI's marks and

engaging in other acts contrary to the interests of SMRI.   Id. at pp. 8-10.

Whether SMRI is entitled to a permanent injunction must be resolved in a further

evidentiary hearing.

### ORDER

Based on the above analysis, it is

ORDERED that defendants' motion (Docket 275) for judgment as a matter

of law is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants' oral Fed. R. Civ. P. 50(a)

motion for judgment as a matter of law on plaintiff's state registration claims is

granted.

IT IS FURTHER ORDERED that the defendants' motion (Docket 275) for judgment as a matter of law as to JRE, Inc., is granted.

IT IS FURTHER ORDERED that the money judgment (Docket 269 ¶ 1) in favor of plaintiff Sturgis Motorcycle Rally, Inc., and against the defendant JRE, Inc., for the sum of $52,500 is vacated.

IT IS FURTHER ORDERED that the remainder of defendants' motion (Docket 275) for judgment as a matter of law is denied.

IT IS FURTHER ORDERED that defendants' motion (Docket 275) for a new trial is denied.

IT IS FURTHER ORDERED that defendants' motion (Docket 276) for the application of equitable defenses is granted in part and denied in part.

IT IS FURTHER ORDERED that SMRI is barred from recovering damages and profits from the defendants for the time period prior to October 30, 2015, the date of the jury verdict.

IT IS FURTHER ORDERED that the money judgment (Docket 269 ¶ 1) in favor of plaintiff Sturgis Motorcycle Rally, Inc., and against the defendants Rushmore Photo & Gifts, Inc., for the sum of $158,750; Carol Niemann for the sum of $156,250; Paul A. Niemann for the sum of $156,250; Brian M. Niemann for the sum of $158,750 and Wal-Mart Stores, Inc., for the sum of $230,000, is vacated.

IT IS FURTHER ORDERED that defendants' equitable defenses do not constitute a defense to SMRI's motion (Docket 278) for a permanent injunction. The court will set a hearing on plaintiff's motion for a permanent injunction.

Dated March 10, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE